Louis B. SMITH, Jr., Appellant,

v.

UNITED STATES, Appellee.

No. 82–1710.

District of Columbia Court of Appeals.

Argued March 12, 1985.

Decided May 8, 1985.

Blair Brown, Public Defender Service, Washington, D.C., with whom James Klein and Randy Hertz, Public Defender Service, Washington, D.C., were on briefs, for appellant.

Lynn Lincoln Sarko, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on brief, for appellee.

Before FERREN and ROGERS, Associate Judges, and PAIR, Associate Judge, Retired.

PAIR, Associate Judge, Retired:

Following a jury trial, appellant was convicted of one count of armed robbery, D.C. Code §§ 22–2901, –3202 (1981),[1] and one count of carrying a pistol without a license, *id.* § 22–3204. As his principal ground for reversal, appellant maintains that the government failed to comply with its dis-covery obligations under Super.Ct.Crim.R. 16(a)(1)(A), as evidenced by its use at trial of previously undisclosed statements he had made to a police detective. Appellant also submits that his trial was tainted by several instances of prosecutorial misconduct. Finally, appellant contends that the trial court erred when it entered an enhanced sentence for the pistol charge without having conducted a hearing pursuant to D.C.Code § 23–111(b) (1981). We find two of these arguments compelling. Accordingly, we reverse and remand for a new trial.[2]

### I. *The Trial Testimony*

This case evolved from events occurring at the Greyhound Bus Terminal in Northwest Washington on January 23, 1982. Charles Bell, the complainant and the government's principal witness at trial, was a passenger on a bus en route to Charleston, South Carolina from Philadelphia, Pennsylvania. During a half-hour layover in Washington, Bell got off the bus and entered the terminal to use the restroom. He recounted at trial that on stairs leading to the restroom he encountered appellant and briefly engaged in conversation. They both then entered the restroom and used its facilities.

Bell testified that as he was about to leave an unidentified man approached him and asked to borrow some change. Bell responded that he did not have any change but that he would go upstairs to get some and then return. At this point, appellant interjected that he had change and gave fifty cents to Bell. As the money was being relayed to the borrower, appellant pulled out a gun, robbed Bell, and then fired it. Bell stated that he then ran upstairs and summoned a security guard, who responded to the situation by pulling a chain across the stairway, thereby cordoning off the exit.

---

1. Section 22–3202 has been amended and is now codified at D.C.Code § 22–3202 (1981 & Supp. 1984).

2. Our conclusion *infra* that the government's failure to comply with Super.Ct.Crim.R. 16(a)(1)(A) warrants reversal makes unnecessary our consideration of the allegations of prosecutorial misconduct.

In the meantime, the police were called. As Bell and the security guard awaited their arrival, appellant appeared in the stairwell and began to make gestures toward Bell. Bell interpreted these gestures to mean that appellant was willing to return money Bell claimed had been stolen. Consequently, Bell, accompanied by the guard, went down the stairway and retrieved his money, his wallet, and the wallet's contents.[3] Bell testified that on his return appellant said: "Okay, Man, you've got your stuff and everything, why don't you be cool and let me go and everything." Appellant was later arrested.[4]

At trial, appellant's version of the critical events was in stark contrast to the account offered by Bell. Appellant denied having robbed Bell and posited the converse as true—he claimed that Bell had robbed him in the restroom of the bus terminal. Appellant testified that when he entered the restroom he saw that six or seven men were involved in a dice game and that Bell was one of them. After using the facilities, appellant joined Bell and the others in the game by "betting on the side line." At one point, Bell, who was also betting on the side line, confronted the man who was rolling the dice, calling him "Shorty," and accused him of playing with "crooked dice." Appellant testified that Bell then grabbed the money off the floor and demanded that appellant return the money he had won. An argument followed which culminated in Bell pulling a gun out of his pocket.

Upon Bell's command, appellant emptied his pockets and returned about $35. Bell then ordered Shorty to do the same. Shorty refused, and when Bell made a threatening advance on him, appellant intervened. He stated that he grabbed Bell and a struggle ensued during which the gun went off. According to appellant, Bell then dropped the gun and ran upstairs.

Appellant related that he and Shorty first discussed what they would do with the gun. He told Shorty that he did not want it and Shorty responded by saying that he (Shorty) would keep it. Appellant then stated that he was going to go after Bell to get his money back, but when he went up the stairs he could go no further because the security guard had cordoned off the exit and refused to let him pass. The reason given by the guard, appellant recalled, was that Bell had implicated "one of them" in the robbery.[5] A few minutes later, the police arrived and Bell identified appellant as the robber, resulting in his arrest.

## II. *Discovery Under Criminal Rule 16(a)(1)(A)*

Appellant was the sole defense witness and on cross-examination he revealed that after his arrest he had given Detective Willie Jefferson an "off the record" statement. To elicit the substance of this statement, the prosecutor asked appellant: "And then you went on and told ... [Detective Jefferson] in fact that you did rob Mr. Bell but he got his money back and why bother with it; isn't that correct?" Appellant admitted telling the detective that he had been "involved" in the incident, but insisted that the involvement he was speak-

---

**3.** Bell could not remember whether appellant had actually taken his wallet. However, he stated that after retrieving his money, he found his wallet in a sink and the wallet's contents in the sink and on the restroom floor.

**4.** Two Metropolitan Police Officers responded to the scene. There they observed the security guard restraining three or four men in the restroom area. Bell immediately implicated appellant as the robber. One of the officers then brought appellant and two of the men to an office in the terminal. There, appellant was arrested and the others, after questioning, were released.

Meanwhile, the other police officer and the security guard searched the restroom and surrounding area. Their search revealed a key in one of the commodes which was then used to open a locker. Inside the locker was a handgun that contained five live rounds and one empty casing in its chambers. This evidence was introduced at trial.

**5.** Shorty apparently followed appellant up the stairs and when he learned of Bell's allegation he retreated to the restroom to get rid of the gun.

ing about related only to the restroom dice game. After the defense rested, the government informed the court that it would call Detective Jefferson as a witness in its rebuttal case. A bench conference ensued during which defense counsel objected to any elaboration of appellant's statement. In the colloquy that followed, counsel argued that it was not his understanding from the discovery made by the government that a more detailed statement had been given to the detective. To this contention the prosecutor replied that appellant's willingness to admit his "involvement" in the incident was tantamount to an admission that he committed the robbery.

The court rejected defense counsel's argument reasoning that the defense had "opened the door" to the statement thereby allowing further government inquiry. Consequently, Detective Jefferson was permitted to testify in rebuttal and he offered the following account:

> Well, after Mr. Smith was advised of his rights, he refused to say anything. On the [PD 47] card he stated he didn't want to say anything. So, while I was sitting there typing up his paperwork, he got to telling me, look, off the record man, this is off the record. I said, yeah, you can go ahead. He said, now, suppose I did give this guy back his money; nobody saw me; he is just saying that I did; I did give it back to him; I mean you would think he would want the case dropped; he got his money back and he wasn't hurt. I said, yeah, okay.
>
> Then he wanted to know how could we put that gun on him after he had put it in the locker....
>
> He said, well, I did put it in the locker and I did throw the key down in the commode, but it wouldn't flush....

It is readily apparent that appellant's statement, as reported by Detective Jefferson, amounted to an admission of guilt. Appellant now contends that the government's disclosure in discovery that he had made a statement admitting his "involvement" did not satisfy its burden under Super.Ct. Crim.R. 16(a)(1)(A). The government counters that it fully complied with its discovery obligations under Rule 16 and adds that "if there was any ambiguity in the disclosure ... [trial] counsel was fully capable of clarifying the matter at the time of discovery."

Rule 16(a)(1)(A) governs certain aspects of discovery and inspection in criminal matters. The rule requires that upon request the government disclose the substance of oral statements by an accused made in response to police interrogation. *Thomas v. United States*, 444 A.2d 952, 953 (D.C.1982) (citing *Rosser v. United States*, 381 A.2d 598, 603 (D.C.1977)).[6] "Substance" in this context connotes disclosure "in enough detail to minimize the undersirable effects of surprise at trial and otherwise contribute to the fair and efficient administration of criminal justice." *Id.* (citing *Lee v. United States*, 385 A.2d 159, 163 (1978)). Thus, once an inquiry has been made by a defendant regarding an oral statement, it is essential that the government respond accurately and unambiguously. *United States v. Lewis*, 167 U.S.App.D.C. 232, 235, 511 F.2d 798, 801 (1975) (construing FED.R.CRIM.P. 16(a)). Otherwise, the integrity of the criminal process cannot be preserved.

It is difficult to accept the government's argument that its disclosure in this case satisfied Rule 16(a)(1)(A). Although there is no record of the disclosure itself,

6. Rule 16(a)(1)(A) is worded as follows:
STATEMENT OF DEFENDANT. Upon request of a defendant the prosecutor shall permit the defendant to inspect and copy or photograph: ... the substance of any oral statement which the government intends to offer *in evidence at the trial* made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent....
    We note that the government concedes in its brief that it had an obligation under this rule to disclose the "substance" of appellant's oral statement to Detective Jefferson. It contends, however, that such disclosure was made. Thus, our inquiry will focus only on this aspect of the rule.

the government concedes that during discovery defense counsel was informed that "the defendant offered to give a statement admitting his involvement, but he would only do it off the record." Yet, at trial, Detective Jefferson recounted with particularity appellant's detailed admission, quoted *supra*. Among other inculpatory remarks, appellant was quoted as saying: "I mean you would think he would want the case dropped; he got his money back and he wasn't hurt." The conclusion is nearly inescapable that the government's disclosure was insufficient. *Compare Thomas, supra,* 444 A.2d at 953 (defendant's statement that she stabbed decedent "after he had advanced on her" sufficiently different than statement that she stabbed decedent "to teach him a lesson" to warrant independent disclosure).[7]

■ On the basis of the evidence presented at trial, we must also conclude that this error requires reversal. As appellant suggests, this case became essentially a credibility contest between himself and the complainant Bell. Although Bell offered a plausible version of the events which may have actually transpired, no government witness was called to confirm his account. The government did not call, for example, any of the men who were present in the bus terminal restroom at the time the incident occurred. Nor did it call the security guard who first rendered assistance to Bell. In short, the government can point to no eyewitness testimony that supports Bell's allegations. Its case-in-chief rested primarily on the testimony of

Bell and the police officers who were summoned to the scene.

Despite the absence of any such supporting testimony, the government offered nothing else which positively linked appellant to the crime. Concededly, a weapon and ammunition were recovered from a locker in the restroom area. However, the sole evidentiary connection to use by appellant came from the testimony of Bell. Moreover, a crime scene specialist testified that he was unable to recover latent fingerprints from the weapon and that he did not attempt to recover fingerprints from the locker.[8] We further note that no money was found on appellant at the time of his arrest.

As we observed, appellant was the only defense witness. His version of the incident, offered on direct-examination, unsurprisingly did little to support Bell's claim. And despite thorough cross-examination, appellant was unyielding: he remained steadfast in his contention that Bell had accosted him. But more than this, when directly questioned about his statement to Detective Jefferson, appellant responded that he did not admit to robbing Bell. Rather, he stated: "I told him that I was involved, and the involvement I was speaking about was the dice game that was going on in the bathroom."

■ Given the conflicting accounts of appellant and Bell, and the sparsity of other evidence implicating appellant, it cannot be reasonably controverted that appellant's

7. We do not agree that defense counsel, once informed of appellant's statement of "involvement," had a duty under Rule 16(a)(1)(A) to ferret out the details of the statement. Although a defendant does have an obligation to make the requisite request, *Rosser, supra,* 381 A.2d at 609, under the rule it is the government's duty to reveal the "substance" of a discoverable oral statement. The government concedes as much. Here, it is quite possible that counsel interpreted the government's disclosure to mean that appellant had simply stated, without amplification, that he was "involved." Moreover, it is conceivable that counsel believed appellant had solely admitted his involvement in the restroom dice game. In any event, the government failed

to properly communicate the substance of appellant's incriminating admissions.

We note that even if the government had not been apprised of appellant's statements at the time of discovery, it had an obligation to enlighten counsel once it had been so informed. Super.Ct.Crim.R. 16(c); *Rosser, supra,* 381 A.2d at 605 (construing former Super.Ct.Crim.R. 16(g)).

8. The crime scene officer also testified that because "[t]oo much time had gone by" he did not perform a nitric acid test on appellant. This test might have revealed gunpowder residue.

admission, as related by Detective Jefferson in the government's rebuttal case, was the decisive factor in his conviction.[9] Appellant's statement cannot, as the government suggests, be construed as merely a corroboration of his admission of "involvement." *See Rosser, supra*, 381 A.2d at 609 (citing *United States v. Johnson*, 525 F.2d 999, 1004 (2d Cir.1975), *cert. denied*, 424 U.S. 920, 96 S.Ct. 1127, 47 L.Ed.2d 327 (1976)). Also, had counsel been apprised of the extent of appellant's confession before trial, "his trial preparation and strategy might well have been different." *Lewis, supra*, 167 U.S.App.D.C. at 235, 511 F.2d at 801. On these bases, we conclude that the error was not harmless.[10]

### III. *Sentencing*

Appellant also assigns as error the enhanced sentence he received for carrying a pistol without a license. The government concedes that the trial court committed sentencing error. Of course, because of the result we reach on appellant's other contention, it is not imperative that we address this issue. However, we shall briefly do so in the event appellant is retried and convicted.

■ The maximum term of imprisonment for carrying a pistol without a license is one year. D.C.Code §§ 22-3204, -3215 (1981). This penalty may be enhanced pursuant to § 23-111(a)(1) if the government files an information as to previous convictions. In the case at bar, the government did so and appellant received a consecutive sentence on the pistol charge of two to six years in prison. This sentence was improper because, as § 23-111(b) makes clear, the trial judge has a duty before pronouncement of sentence to:

inquire of the person with respect to whom the information was filed whether he affirms or denies that he has been previously convicted as alleged in the information, and shall inform him that any challenge to a previous conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence.

Since the trial judge did not comply with the mandatory inquiry and advice procedures, it was error to enhance appellant's sentence. *See Smith v. United States*, 356 A.2d 650, 651–52 (D.C.1976).

*Reversed.*

---

9. We recognize that appellant's credibility was impeached at trial by several prior convictions. This impeachment was not so damaging, however, to render the subsequent error harmless. *See Rosser, supra*, 381 A.2d at 609 n. 12.

10. Harmless error may be found if we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not

substantially swayed by the error...." *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). This court has held that "[t]he decisive factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *Thomas, supra*, 444 A.2d at 954 (quoting *Smith v. United States*, 392 A.2d 990, 993–94 (D.C.1978)).